IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| ROSE VALLEJO, on behalf of minor child A.V.,<br><br>Plaintiff,<br><br>vs.<br><br>DUCHESNE COUNTY, SGT. CARL REILLEY, SHERIFF DAVID L. BOREN, and DOES 1-10,<br><br>Defendants. | MEMORANDUM OF DECISION AND ORDER<br><br><br>Case No. 2:17-cv-0776 |

On April 14, 2017, Defendant Carl Reilley, a sergeant with the Duchesne County Sheriff's Office, detained A.V., a thirteen-year-old with autism, after he saw A.V. peering into the windows of the public library. During the encounter, A.V. was placed on the ground and handcuffed. After determining that A.V. had not committed a crime and was not dangerous, Sgt. Reilley drove A.V. home.

A.V. filed suit on July 12, 2017.[1] In the operative second amended complaint, he asserts that Sgt. Reilley infringed his constitutional rights in violation of 42 U.S.C. § 1983 by (1) detaining him without reasonable suspicion; (2) arresting him without probable cause; and (3)

---

[1] The suit was filed by Plaintiff Rose Vallejo, A.V.'s mother, on A.V.'s behalf. For convenience, the court refers to A.V. as the plaintiff throughout this order.

using excessive force during the stop.  A.V. also alleges that Defendant David Boren, the police

chief of the Duchesne County Sherriff's Office, ratified Sgt. Reilley's conduct, making both

Chief Boren and Defendant Duchesne County equally liable for the constitutional violations.

Sgt. Reilley now moves for summary judgment (ECF No. 51), arguing he is protected

from suit by the doctrine of qualified immunity.  In the same motion, Chief Boren and Duchesne

County argue there was no ratification, meaning they cannot be liable for Sgt. Reilley's conduct.

For the reasons stated below, the court concludes Sgt. Reilley is immune from suit on the

detention claim, but not on the arrest or excessive force claims.  The court also concludes Chief

Boren and Duchesne County cannot be held liable for Sgt. Reilley's conduct.

## I.      BACKGROUND

On April 14, 2017, Sgt. Reilley drove past the city library and noticed A.V. peering

through the windows.  (ECF No. 52-2, Appendix of Evidence, Ex. B,[2] Deposition of Carl Reilley

("Reilley Depo.") at 25:4-8.)  Because bushes had been planted in front of the windows, it was

clear that A.V. had climbed through them to get to the window.  (Id. at 25:8-11.)  A.V. was

wearing a hoodie, with the hood pulled up.  (Id. at 25:11-12.)  As Sgt. Reilley drove by, A.V.

stepped away from the window and moved toward another set of windows.  After peering in

those windows, A.V. continued moving along the building, stopping to look through the library's

main doors.  (Id. at 25:13-19.)

At this point, Sgt. Reilley pulled over, got out of his vehicle, and called out to A.V.,

"Hey, come here, I want to talk."  (Id. at 25:20-21; 28:1-3.)  A.V. ignored the command and

continued walking past the doors and along other library windows.  (Id. at 28:20-22.)  Sgt. Reilly

---

[2] All exhibits cited in this order come from ECF No. 52, the Defendants' Appendix of Evidence.

again yelled out "Come here, I need to talk to you."  (Id. at 28:23-24.)  Then A.V. "took ten real fast steps, like he was going to start running," so Sgt. Reilley again ordered A.V. to come to him.  (Id. at 28:24-29:1.)  This time, A.V. began walking toward Sgt. Reilley.  Sgt. Reilley told him to remove his hands from his pockets and, when he was about twenty feet away, A.V. complied, putting his hands "up as high as he could."  (Id. at 29:1-10.)  Sgt. Reilley testified that "at that point, I could see he was a younger guy," (id. at 29:10-11), who appeared to be "under 20."  (Id. at 41:17.)  In fact, A.V. was thirteen. (ECF No. 52-3, Ex. C, Deposition of A.V. at 43:17-44:11.)

"[A]t that time . . . the body camera kicked on."  (Reilley Depo. at 30:17-18.)  Sgt. Reilly testified that although he asked A.V. what he was doing and whether he had any weapons on him, A.V. wasn't responding.  (Id. at 31:2-11.)  But as A.V. notes in opposition, the body camera footage only records Sgt. Reilley asking, "What's going on?"  A.V. then appears to respond to the question, although either because of the wind or because he is speaking softly, his response is inaudible.  Sgt. Reilley then asks, "You can what?"  (ECF No. 52-4, Ex. D, Reilly Body Camera Footage ("Body Cam") at 00:02-00:06.)

Before A.V. could answer, Sgt. Reilley lifted his radio to request back up.  At that point A.V. lowered his arms, although he did not move away.  (Id. at 00:07-00:09.)  Sgt. Reilley put down his radio and ordered A.V. to lift his hands again.  After A.V. complied, Sgt. Reilley grabbed A.V.'s right arm, telling A.V. to turn around.  (Id. at 00:10-00:12.)  Sgt. Reilley testified that his intent, at that point, was to ensure A.V. did not run away and to search him for weapons.  (Reilley Depo. at 53:19-21, 54:1-6.)  A.V. initially complied by turning around, but as Sgt. Reilley pulled his arm, A.V. cried out and tried to pull away.  Sgt. Reilley spun A.V. around and placed him on the ground.  (Body Cam at 00:13-00:20.)

Holding A.V. down, Sgt. Reilley tried to request back up on his handheld radio, but he didn't have a clear signal.  (Id. at 00:21-00:35.)  Other than telling A.V. to hold still and asking, "What is your problem," Sgt. Reilley did not address A.V. during this time.  Sgt. Reilley handcuffed A.V.'s hands behind his back, while A.V. was still face down on the ground.  (Id. at 00:35-00:40.)  When A.V. said that he didn't want to go to jail, Sgt. Reilley responded, "You haven't been to jail yet, but you're going to go there.  Now talk to me."  (Id. at 00:42-00:47.)  Sgt. Reilley again asked, "What is going on," and A.V. said nothing was going on.  (Id. at 00:47-00:52.)  Sgt. Reilley said, "You were running from me, and now you're not," and that he wanted to know why.  (Id. at 00:53-00:57.)  During this time, A.V. was crying out for help, and Sgt. Reilley told him to "stop."  (Id. at 0058.)  Sgt. Reilley asked if A.V. had any weapons, apparently for the first time, and ran his hands around A.V.'s waistband to check.  (Id. at 01:00-01:06.)

At that point, Sgt. Reilley turned off his body camera.  (Id. at 01:06.)

Utah Highway Patrol Trooper Nathan Mikulich then arrived and held A.V. down while Sgt. Reilley returned to his car to report the incident.  (ECF No. 52-5, Ex. E, Deposition of Nathan Mikulich ("Mikulich Depo.") at 10:22-11:6.)  Trooper Mikulich asked A.V. if he had any identification, and A.V. said no.  (ECF No. 52-6, Ex. F, Dashboard Camera Footage ("Dashboard Cam") at 12:00:00-12:00:06.)  Trooper Mikulich then questioned A.V., and learned his name, but was otherwise unable to discover anything from A.V. about the situation.  (Id. at 12:00:20-12:00:27.)  At his deposition, Trooper Mikulich testified that at the time, he believed A.V. was fifteen or sixteen years old, and he initially thought A.V. was intoxicated or had been using methamphetamine.  (Mikulich Depo. at 12:12-15.)  But in a report Trooper Mikulich wrote one week after the event, he indicated that, at the time he approached the scene, he believed A.V. was

between thirteen and fifteen. (Id. at 50:19-24.) Eventually Trooper Mikulich and Sgt. Reilley helped A.V. stand up, and at that point—after A.V. made several comments about wanting to go to the zoo—Trooper Mikulich told Sgt. Reilley that he believed A.V. had autism, which A.V. then confirmed. (Dashboard Cam at 12:00:50-12:01:30.) Sgt. Reilley and Trooper Mikulich then put A.V. in the backseat of Sgt. Reilley's vehicle and took A.V. home. (Reilley Depo. at 39:6-15, 41:1-5, 41:20-42:22.)

Three days later, after seeing A.V.'s mother in town, Trooper Mikulich told Chief Boren that she was quite upset about the encounter. (Id. at 57:3-15, 58:3-6.) Chief Boren said, "If he can't be on his own, then we need to make sure that he's not out in public on his own." (Id. at 59:24-60:7.) Trooper Mikulich had planned on asking Chief Boren if Trooper Mikulich could arrange to take A.V. to the zoo, so that he would no longer be scared of the police. But based on Chief Boren's comment, Trooper Mikulich dropped the idea, believing he would not be receptive. (Mikulich Depo. at 54:19-25, 60:7-60:13.) Trooper Mikulich testified that Chief Boren had made similar statements like this in the past. (Id. at 87:23-88:1.) Chief Boren denies having ever made such a statement. (ECF No. 52-9, Ex. I, Deposition of David Boren ("Boren Depo.") 31:6-11.)

Several weeks later, the Duchesne County Sheriff's Office reviewed Sgt. Reilley's conduct during the encounter. A panel recommended giving Sgt. Reilley a verbal warning for not having his body camera activated during the entire incident, but otherwise did not identify any problems with Sgt. Reilley's conduct. (ECF No. 52-7, Ex. G, After-Action Review.) At Chief Boren's direction, Sgt. Reilley's supervisor gave him Sgt. Reilley the recommended verbal warning. (ECF No. 52-8, Ex. H, Boren Directive.) Chief Boren also ordered that "all Sheriff's

Office Patrol personnel receive training on recognizing signs of mental health and[/]or special needs individuals at our earliest opportunity."  (Id.)

## II.    LEGAL STANDARD

A court must grant summary judgment when the moving party "shows that there is no genuine dispute as to any material fact" and that the party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Summary judgment should not be granted "if the dispute about a material fact is 'genuine,' that is, when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is genuine when "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998).  The court must draw all reasonable inferences from the record in favor of the nonmovant.  Id.

Qualified immunity is "'an immunity from suit rather than a mere defense to liability[.]'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)).  "Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (citing Saucier v. Katz, 533 U.S. 194, 206 (2001)).

To determine whether to grant qualified immunity, courts apply the two-part test set forth in Saucier.  Under that test, the court first determines whether the officer violated the plaintiff's constitutional rights.  In making this determination, the facts are viewed in the light most favorable to the plaintiff.  Morris v. Noe, 672 F.3d 1185, 1189 (10th Cir. 2012).  If the court

finds a violation, the court then analyzes whether the right was clearly established at the time of the officer's conduct. <u>Brosseau</u>, 543 U.S. at 195.

### III. ANALYSIS

A. <u>Prong 1: Violation of Constitutional Rights</u>

The Fourth Amendment prohibits government officials from conducting "unreasonable searches and seizures." U.S. Const. amend. IV. The Tenth Circuit recognizes "three categories of police-citizen encounters: '(1) consensual encounters which do not implicate the Fourth Amendment; (2) investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity; and (3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause.'" <u>United States v. Lopez</u>, 443 F.3d 1280, 1283 (10th Cir. 2006) (quoting <u>United States v. Torres–Guevara</u>, 147 F.3d 1261, 1264 (10th Cir.1998)). Additionally, whether engaged in an investigative detention or an arrest, the police must use only that force that is "reasonable," given the totality of the circumstances. <u>Graham v. Connor</u>, 490 U.S. 386 (1989).

A.V. argues his constitutional rights were violated in three ways: (1) A.V. was stopped for an investigative detention without reasonable suspicion; (2) A.V. was arrested without probable cause; and (3) Sgt. Reilley used excessive force in seizing A.V.

1. Reasonable Suspicion for the Investigative Detention

Here, the parties agree that an investigative detention occurred, but they disagree on when it began. A.V. argues that as soon as Sgt. Reilley asked A.V. to come over, a detention had been initiated. In support of this proposition, A.V. cites <u>United States v. Dell</u>, 487 F. App'x 440 (10th Cir. 2012), but that case is not analogous. There, an officer called out "Hey, come over" to

a suspect; the suspect "promptly complied with the instruction and approached Officer Tafisi's patrol car;" and "the government concede[d] that by the time Officer Tafisi said, 'Hey, come over,' a Fourth Amendment seizure began." Id. at 442. But A.V. did not promptly comply with Sgt. Reilley's request to speak to him but continued walking along the front of the library and looking in different windows.

Sgt. Reilley maintains that the investigative detention did not begin until the third time Sgt. Reilley called out to A.V., and A.V. complied and began walking toward him. The court agrees. An investigative detention begins once "(a) the officer shows his authority; and (b) the citizen submits to the assertion of authority." United States v. McHugh, 639 F.3d 1250, 1256 (10th Cir. 2011) (internal quotations omitted). A.V. did not submit until after the third time Sgt. Reilley called out. That is when the investigative detention began.

Accordingly, to prevail, A.V. must demonstrate that the facts known to Sgt. Reilley at the time A.V. began walking toward him would not provide a reasonable officer with the level of suspicion necessary to support an investigative detention.

> An officer "can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause." Id. For an officer to have reasonable suspicion to seize an individual, the officer "must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." Id.

Cortez v. McCauley, 478 F.3d 1108, 1115 (10th Cir. 2007). Reasonable suspicion must be "more than an inchoate and unparticularized suspicion or hunch." United States v. Chavez, 660 F.3d 1215, 1221 (10th Cir. 2011). Additionally, reasonable suspicion "is measured by an objective standard; the agents' subjective beliefs and intentions . . . are irrelevant." United States v. De La Cruz, 703 F.3d 1193, 1196 (10th Cir. 2013).

Sgt. Reilley first contends that he was suspicious because A.V. was wearing a hoodie with his hood up.  But Sgt. Reilley concedes it was about 60 degrees that day.  (Reilley Depo. at 26:25.)  There is nothing suspicious about wearing a jacket in 60-degree weather.

Second, Sgt. Reilley argues it was suspicious that A.V. had pushed through bushes to peer through the library windows.  A.V. argues such conduct is not suspicious and again cites to Dell for support.  There, an officer stopped a man after he observed him "peering into the windows of a car which was legally parked on the street."  Dell, 487 F. App'x at 442.  The Tenth Circuit held this was not sufficient to provide reasonable suspicion:

> The conduct observed by Officer Tafisi was so innocuous and so very much in the realm of ordinary behavior that it would not lead a reasonable officer to suspect that a car break-in had occurred or was about to occur.
>
> . . .
>
> To be sure, common sense tells us that if a break-in was happening, the observed conduct would almost necessarily be a part of that sequence of events. However, common sense also tells us that an array of lawful activities would also include the observed behavior. Peering into a car, we assume, typically occurs when a break-in happens; but it also occurs at many other times when nothing illegal is happening. Underscoring this point, Officer Tafisi only observed Mr. Dell and his companion having a momentary, fleeting interest in the vehicle—Mr. Dell and his companion had walked away from the car almost immediately after Officer Tafisi observed them peering into it. Perhaps a prolonged observation of Mr. Dell would have revealed behavior more closely associated with criminal activity. But what Officer Tafisi actually saw was too tame to suggest reasonable suspicion.

Id. at 446 (emphasis in original).

But A.V.'s conduct was more questionable than the conduct in Dell.  First, A.V. had to climb through bushes to peer through the library window.  This is different than looking in a car window while walking down a public sidewalk.  Second, unlike in Dell, A.V.'s conduct was not temporary: He went from window to window looking inside, which is more closely associated

with criminal behavior than the "momentary, fleeting interest" that occurred in <u>Dell</u>. This conduct would support a finding of reasonable suspicion.

Additionally, Sgt. Reilley testified that A.V. "took ten real fast steps, like he was going to start running," after Sgt. Reilley called to him for the second time. (Reilley Depo. at 28:24-25.) Again, A.V. notes that in <u>Dell</u>, the Tenth Circuit held that the officer lacked reasonable suspicion when the suspect "walked away from the parked car upon seeing that the patrolling officer was headed in their direction." <u>Dell</u>, 487 F. App'x at 444. But the Tenth Circuit specifically noted the outcome might have been different had it appeared the suspect was avoiding the officer. "[H]ere, walking away is arguably the <u>least</u> suspicious activity that Mr. Dell could have engaged in. After all, as we have just stated, running away certainly would have been suspicious. And staying put, continuing to linger around the car that the officer thought was the target of a break-in, would have added to the officer's suspicion." <u>Id.</u> at 445. Here, A.V. appears to have engaged, at least somewhat, in both acts that the <u>Dell</u> court warned could be suspicious: he first lingered at the library, looking in additional windows, and then he began walking away from Sgt. Reilley at an accelerated speed.[3] When combined with the unusual climbing through bushes to look through library windows, this fact also supports a finding of reasonable suspicion.

A.V. argues that it would be unreasonable for Sgt. Reilley to suspect that a break-in or similar crime was being committed in broad daylight at noon on a Friday. Because the court

---

[3] The court briefly notes that Sgt. Reilley's description of A.V.'s fast steps is vague. In the motion, Sgt. Reilley repeatedly characterizes A.V. has having run away from him. (ECF No. 51, Motion at 4, 15, 20.) But his testimony was that A.V. looked like he <u>might</u> run, based on the speed of his steps, not that he <u>was</u> running. The court concludes that quickly walking away and running away would both be somewhat suspicious on the facts here, so the distinction matters little. But the court notes that in other contexts, walking quickly and running away would be two very different acts, and they should not be so easily conflated.

must consider the totality of the circumstances, this observation is relevant. However, this factor alone does not outweigh the other suspicious circumstances.

For the above reasons, the court concludes that a reasonable officer in Sgt. Reilley's position would be reasonably suspicious of A.V.'s conduct, such that an investigatory detention could be initiated. A.V. has not demonstrated his initial detention was in violation of his constitutional rights, and Sgt. Reilley is therefore entitled to qualified immunity on this claim.

2. Probable Cause for the Arrest

i. Was A.V. arrested?

A.V. argues that the investigatory detention eventually escalated into an arrest. Sgt. Reilley contends that A.V. was never arrested.

> A warrantless arrest is permissible when an officer "has probable cause to believe that a person committed a crime." Romero v. Fay, 45 F.3d 1472, 1476 (10th Cir.1995). An arrest is distinguished by the involuntary, "highly intrusive" nature of the encounter. Oliver, 209 F.3d at 1186. "[T]he use of firearms, handcuffs, and other forceful techniques" generally exceed the scope of an investigative detention and enter the realm of an arrest. See United States v. Melendez–Garcia, 28 F.3d 1046, 1052 (10th Cir.1994). "Probable cause to arrest exists only when the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." United States v. Valenzuela, 365 F.3d 892, 896 (10th Cir.2004) (internal quotation marks omitted).

Cortez, 478 F.3d at 1115-16.

Although being handcuffed and placed on the ground, as A.V. was here, would generally be enough to find that an investigatory stop had turned into an arrest, there is an exception if such techniques were "reasonably necessary to protect [the officer's] personal safety and to maintain the status quo during the course of the stop." U.S. v. Mosley, 743 F.3d 1317, 1329 (10th Cir. 2014).

This inquiry is necessarily "fact-sensitive . . . and depends on the totality of the circumstances in a given case." United States v. Salas-Garcia, 698 F.3d 1242, 1249 (10th Cir. 2012) (internal quotation marks omitted). That said, "[i]n weighing the officers' actions, we . . . give allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." United States v. Hood, 774 F.3d 638, 643 (10th Cir. 2014) (internal quotation marks omitted), overruling on other grounds recognized by United States v. Titties, 852 F.3d 1257 (10th Cir. 2017).

United States v. Soza, 686 F. App'x. 564, 568 (10th Cir. 2017).

Here, the court concludes placing A.V. on the ground and handcuffing him escalated the investigative detention to an arrest.

Sgt. Reilley maintains that he was concerned A.V. was dangerous. But Sgt. Reilley testified that he is 6'5" and that A.V. "wasn't a very big guy." (Reilley Depo. 35:14-19.) The body camera footage confirms A.V. was quite small. A.V. could only pose a threat to Sgt. Reilley if he was armed. But, at least once the body camera began filming, Sgt. Reilley never asked A.V. whether he was armed, and never asked to check him for weapons. While it is possible he asked these questions before the camera turned on, his deposition testimony on the matter is, at best, ambiguous. First, Sgt. Reilley's testimony at least strongly implies the camera was on before he began asking any questions. (Reilley Depo. at 30:17-18.) Second, Sgt. Reilley testified only that he "probably" asked A.V. "once" whether he was armed before putting him on the ground. (Reilley Depo. 54:14-19.) Construing the facts in the light most favorable to A.V., a jury could conclude that Sgt. Reilley did not ask A.V. whether he was armed or whether he would object to being searched before he put him on the ground. A.V.'s conduct did not otherwise suggest that A.V. was armed. In these circumstances, a reasonable officer would not assume A.V. was a threat who needed to be handcuffed and held down.

Sgt. Reilley then suggests that maintaining the status quo of the investigative detention required that A.V. be restrained because otherwise he would run away. The court disagrees. At the point when Sgt. Reilley grabbed A.V., he was standing still and had complied with Sgt. Reilley's order to place his hands in the air. (Body Cam. at 00:10-00:12.) Nothing suggested he was about to flee. Sgt. Reilley notes that, once he grabbed A.V.'s arm, A.V. began to struggle with him. As an initial matter, the court disagrees with Sgt. Reilley's characterization of this struggle as an attempt to flee. At least at first, A.V. merely tries to pull his arm away from Sgt. Reilley. Only after Sgt. Reilley begins pushing him to the ground does A.V. call for help and appear to be trying to get away. (Id. at 00:10-00:20.) More importantly, Sgt. Reilley did not explain to A.V. either that he was about to grab his arm or why he wanted A.V. to turn around. (Id.) Sgt. Reilley's conduct came without warning. Before placing him on the ground and handcuffing him, A.V. was compliant. Maintaining the status quo did not require the use of forceful techniques. On the contrary, Sgt. Reilley's decision to grab A.V. was an escalation of the situation.

The court concludes that by pulling A.V. to the ground and handcuffing his hands behind his back, Sgt. Reilley arrested A.V.

ii. Did Sgt. Reilley have probable cause to arrest A.V.?

The court must next determine whether Sgt. Reilley had probable cause to arrest A.V.

Sgt. Reilley argues he had probable cause to arrest A.V. for violating Utah Code section 76-8-305, which reads:

> A person is guilty of a class B misdemeanor if the person knows, or by the exercise of reasonable care should have known, that a peace officer is seeking to effect a lawful arrest or detention of that person . . . and interferes with the arrest or detention by:

. . .

(b) refusing to perform any act required by lawful order:

    (i) necessary to effect the arrest or detention; and

    (ii) made by a peace officer involved in the arrest or detention; or

(c) refusing to refrain from performing any act that would impede the arrest or detention.

Utah Code Ann. § 76-8-305 (West 2017)

Sgt. Reilley argues that A.V. violated this provision "each time he refused to comply with Sgt. Reilley's commands that he identify himself and explain his presence and conduct" and "each time that he attempted to flee."  (ECF No. 51, Motion at 19-20.)  But there is no evidence A.V. attempted to flee, and there are issues of fact regarding whether he disobeyed any commands.

First, the evidence simply does not support a finding that A.V. "attempted to flee."  At most, he took "ten real fast steps" before stopping and complying with Sgt. Reilley's order to come to him.  Those steps do not count as "fleeing," especially given his subsequent compliance with Sgt. Reilley's orders.  And his attempt to pull his arm away from Sgt. Reilley and run away cannot justify Sgt. Reilley's arrest because it did not occur until the arrest had already been initiated.  It is circular to suggest that A.V. was arrested for attempting to flee when the attempt to flee only started after Sgt. Reilley had grabbed A.V.'s arm, without explanation, and turned him around.  Because A.V. did not attempt to flee in violation of Section 76-8-305, at least not until after the arrest was initiated, Sgt. Reilley did not have probable cause to arrest him under that provision.

Next, there are disputed facts regarding whether A.V. refused to comply with Sgt. Reilley's commands. For A.V. to violate this provision, Sgt. Reilley had to have given a lawful order. Sgt. Reilley testified that he turned on his body camera as soon as A.V. had walked toward him with his arms in the air. (Reilley Depo. at 30:17-18.) The only questions he asked from that point on were "What's going on," and, when he couldn't hear the answer either due to wind or the fact that A.V. was mumbling, "You can what?" And following the second question, Sgt. Reilley did not even give A.V. time to respond, as he immediately moved to grab his arm at that point. In the court's view, responding too quietly to a single question about "what's going on" is not the same as disobeying a lawful order.

This conduct is simply not analogous to the cases cited by Sgt. Reilley in support of his argument. In <u>Oliver v. Woods</u>, 209 F.3d 1179 (10th Cir. 2000), the suspect affirmatively refused two direct requests to provide identification, even after the officer quoted the relevant Utah statute providing that police officers were entitled to request identification during investigative detentions. The suspect then informed the officer he was going to drive away; the officer told him he was not allowed to leave; and the suspect still drove anyway. <u>Id.</u> at 1182-83. Here, the evidence simply does not rise to a similar level of interference. A.V. did respond, however quietly, to the only question Sgt. Reilley asked before he was arrested. In all other ways, he was compliant and cooperative, up until Sgt. Reilley grabbed him without any warning.

Notably, when Trooper Mikulich did finally ask A.V. for identification, he told him that he didn't have any (Dashboard Cam at 12:00:00-12:00:06), and when Trooper Mikulich asked for his name, he gave it (<u>id.</u> at 12:00:20-12:00:27). This further calls into question the idea that A.V. was ignoring any lawful orders.

The other case cited by Sgt. Reilley, Youbyoung Park v. Gaitan, 680 F. App'x 724 (10th Cir. 2017), actually supports A.V.'s contention that there was no probable cause to arrest him. There, the police argued that a suspect had violated a New Mexico statute that prohibited resisting arrest because "resisting" should be interpreted to include "the failure to follow a lawful police command." Id. at 734. The Tenth Circuit held that, regardless of the interpretation of "resisting," the facts did not show that the suspect had disobeyed any lawful orders.

> Defendants' argument tacitly requires us to accept their view of the facts—viz., that Officer Gaitan advised Mr. Park that he had a search warrant to review the video footage, and asked (or demanded) that Mr. Park help him access the video. As explained supra, however, our legal framework in this context requires us to reject Defendants' version of events, in favor of Mr. Park's account that (1) Defendants approached him without explaining the purpose for the encounter, (2) without providing a copy of the search warrant or an opportunity to review its contents, and (3) without issuing any orders or commands. Viewed that way, the record provides no factual basis to apply Defendants' lawful-order theory of criminal conduct to Mr. Park. In other words, accepting Mr. Park's version of the facts, Defendants never gave him an order—lawful or otherwise. Thus, even if we concluded that the failure to follow a lawful order constitutes a violation of Section 30-22-1(A) (despite the paucity of authority on that specific question), Defendants have not demonstrated probable cause under that theory.

Id. at 734.

Viewing the facts in the light most favorable to A.V., A.V. had complied with lawful orders to approach Sgt. Reilley and keep his hands up. The only order he arguably disobeyed was his failure to respond to the question, "What's going on?" The court is skeptical asking such a question even counts as an order. Assuming it did, A.V. at least attempted to comply by responding, though quietly, to the question. Aside from that, no other commands were given. And similar to the situation in Youbyoung Park, Sgt. Reilley never explained his purpose in grabbing A.V.'s arm and turning him around, so A.V. could not have been disobeying a lawful order during the encounter.

Finally, the Utah Supreme Court case <u>In re Goodman</u>, 531 P.2d 478 (Utah 1975) provides a persuasive cautioning against overreading this statute. The Supreme Court held, under an earlier version of the statute, that a teenage passenger acting disrespectfully to a police officer while the officer wrote the driver a citation did not violate Section 76-8-305 because "the legislature did not intend to make a simple interruption or distraction of an officer in performing his duties a criminal offense." <u>Id.</u> at 479. A.V.'s conduct in responding to Sgt. Reilley's questions appears more analogous to a "simple interruption or distraction" than to actual interference of the detention, and should not be exaggerated.

In the circumstances, a reasonable officer would not believe there was probable cause to arrest A.V. for violating Section 76-8-305. For that reason, A.V. has carried his burden in showing a constitutional violation regarding his arrest.

3. Use of Excessive Force

Finally, A.V. argues his constitutional rights were violated when Sgt. Reilley used excessive force to arrest him.

> Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of "'the nature and quality of the intrusion on the individual's Fourth Amendment interests'" against the countervailing governmental interests at stake. . . . Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," <u>Bell v. Wolfish</u>, 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979), however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. See <u>Tennessee v. Garner</u>, 471 U.S., at 8-9, 105 S.Ct., at 1699-1700 (the question is "whether the totality of the circumstances justifie[s] a particular sort of . . . seizure").

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision

of hindsight. . . . "Not every push or shove, even if it may later seem unnecessary
in the peace of a judge's chambers," <u>Johnson v. Glick</u>, 481 F.2d, at 1033, violates
the Fourth Amendment. The calculus of reasonableness must embody allowance
for the fact that police officers are often forced to make split-second judgments—
in circumstances that are tense, uncertain, and rapidly evolving—about the
amount of force that is necessary in a particular situation.

<u>Graham v. Connor</u>, 490 U.S. 386 (1989).

Here, the factors identified in <u>Graham</u> mostly support A.V.'s claim of excessive force.

Looking at the severity of the crime, there was no crime. Though Sgt. Reilley had reasonable

suspicion that something was amiss, no crime was in progress, and there was only minimal

evidence that one might have been contemplated or could have occurred. A.V. also did not pose

an immediate threat to Sgt. Reilley. As noted, Sgt. Reilley was much larger than A.V., and

although Sgt. Reilley feared that A.V. had a weapon, Sgt. Reilley did not ask A.V. whether he

was armed until after A.V. was on the ground. Moreover, there appears to be no reason Sgt.

Reilley did not simply ask A.V. for permission to search him, and then pat him down. Finally,

while it is true that A.V. tried to pull away from Sgt. Reilley after Sgt. Reilley grabbed his arm,

and so was perhaps resisting arrest, A.V.'s reaction can at least in part be attributed to the fact

that Sgt. Reilley never explained to him what he was about to do. Accordingly, the first two

factors favor A.V., and the third factor favors Sgt. Reilley only moderately, if it favors anyone at

all.

And the entire encounter is colored by A.V.'s youth and the fact that he has autism. Sgt.

Reilley testified that he believed A.V. was "under 20," and that he did not realize he had autism

until later. But after viewing the body camera footage, the court concludes it is an issue of fact

for the jury to determine whether a reasonable officer in Sgt. Reilley's position would have

realized much earlier that he was dealing with a child, with someone with autism, or both.

Accordingly, the court concludes A.V. has carried his burden in establishing that a jury could reasonably find that excessive force was unconstitutionally applied against him.

B. Prong 2: Clearly Established Constitutional Rights

Because A.V. has carried his burden in showing that Sgt. Reilley lacked probable cause to arrest him and used excessive force against him, the court must turn to the second prong of the analysis for those claims. The court concludes, in both instances, that the constitutional rights violated by Sgt. Reilley were clearly established.

> A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right. Although plaintiffs can overcome a qualified-immunity defense without a favorable case directly on point, existing precedent must have placed the statutory or constitutional question beyond debate. The dispositive question is whether the violative nature of the particular conduct is clearly established. In the Fourth Amendment context, the result depends very much on the facts of each case, and the precedents must squarely govern the present case.

Youbyoung Park, 680 F. App'x at 736 (citing Aldaba v. Pickens, 844 F.3d 870, 877 (10th Cir. 2016)) (internal quotations omitted).

Regarding probable cause, Sgt. Reilley's own cited caselaw supports finding that the right was clearly established. As discussed above, in Youbyoung Park, the Tenth Circuit found that there was a constitutional violation when officers arrested a man for ignoring a lawful order, and the man had not in fact ignored any such order. Id. at 734-36. The Tenth Circuit went on to find that such a constitutional violation was not clearly established at the time. Id. at 737-38. But Youbyoung Park was issued before the arrest that occurred in this case, so it is no longer true that the right was not established: Youbyoung Park itself provides the basis for finding that the right was clearly established. And as discussed above, In re Goodman by the Utah Supreme

Court advances a reading of this statute that would also clearly establish that Sgt. Reilley lacked probable cause to arrest A.V.  See In re Goodman, 531 P.2d at 479.

Legal authority also exists regarding excessive force.

> Because the existence of excessive force is a fact-specific inquiry . . . there will almost never be a previously published opinion involving exactly the same circumstances. . . .  Thus, we have adopted a sliding scale: The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.

Morris, 672 F.3d at 1196 (internal citations omitted).

In Morris, the Tenth Circuit held that police used excessive force when they tackled a man to the ground as part of an arrest.  The court noted that two of the Graham factors fully supported a finding of excessive force, even though one factor slightly favored the officers.  First there was some evidence that the officers believed the man was about to commit assault, which would be a severe crime and would justify using force.  But he was not an immediate threat, based on where he was standing (although he was large and had made some threatening statements) and he had done nothing to resist arrest.  Id. at 1195-96.  The court held that it was clearly established, in these circumstances, that tackling him to the ground violated his constitutional rights.  Id. at 1198.  Here, like in Morris, two Graham factors clearly support A.V.: He was not a threat (and, indeed, was even less of a threat than the individual in Morris, given his size and lack of any threatening behavior), and Sgt. Reilley could not articulate what, if any, crime he suspected A.V. had committed, let alone whether he was about to commit a severe or particularly dangerous crime.  The third factor, resisting arrest, slightly favors Sgt. Reilley insofar as A.V. began to struggle when Sgt. Reilley grabbed his arm, but as discussed, this was understandable under the circumstances as Sgt. Reilley never explained to A.V. why he was

grabbing him.  Under these facts, it was clearly established that placing A.V. on the ground was a violation of his constitutional rights.

Accordingly, the court concludes A.V. has prevailed on both prongs of the qualified immunity analysis for his probable cause and excessive force claims.  Sgt. Reilley is not entitled to qualified immunity for A.V.'s claims of unlawful arrest and excessive force.

C.  Ratification

Plaintiff contends that Chief Boren and Duchesne County are also liable under § 1983 because they ratified Sgt. Reilley's unconstitutional actions.

> A municipality may not be held liable under § 1983 solely because its employees inflicted injury on the plaintiff.  Rather, to establish municipal liability, a plaintiff must show 1) the existence of a municipal policy or custom, and 2) that there is a direct causal link between the policy or custom and the injury alleged.

Bryson v. City of Oklahoma City, 627 F.3d 784, 788 (10th Cir. 2010).  One way to establish the existence of a municipal policy or custom is by showing "ratification by . . . final policymakers of the decisions—and the basis for them—of subordinates."  Id.

Here, there was a ratification: The After-Action Review panel concluded Sgt. Reilley had acted properly, and Chief Boren affirmed this conclusion.  (App. Ex. G, H.)  But that only resolves the first inquiry, whether there was a municipal policy or custom.  A.V.  must also show a direct causal link between the ratification and the unconstitutional conduct.  Several courts have concluded that internal reviews conducted after-the-fact cannot cause the underlying violation, and so do not support municipal liability.  See, e.g., Estate of Valverde v. Dodge, Civil Action No. 16-cv-01703-MSK-MEH, 2017 WL 1862283 at *10 (D. Colo. May 9, 2017) ("Plaintiff contends that by declaring the shooting to be within DPD policy, Denver ratified Dodge's unconstitutional actions. . . .  [B]ecause the alleged ratification happened after the

shooting, Plaintiff had already suffered the injury by the time it occurred.  Therefore, Denver's

acceptance and praise of Dodge's conduct did not cause Valverde's injury."); Coffee v. City of

Oklahoma City, No. CIV-08-239-W, 2009 WL 10669175 at *5 (W.D. Okla. Aug. 04, 2009)

(plaintiff failed to show "a direct causal link between any City policy approving and condoning

Sgt. Walsh's action and the alleged constitutional violation.").  A.V. identifies no case in which a

later review was found to be the cause of an earlier violation.[4]

A.V. argues that Chief Boren's conduct went beyond approving the After-Action Review

panel's recommendations.  He also told Trooper Mikulich that "If [A.V.] can't be on his own,

then we need to make sure that he's not out in public on his own," and had made similar

statements in the past.  (Mikulich Depo. 59:16-60:13, 87:23-88:1.)  But the court does not see

how these statements could cause Sgt. Reilley to arrest A.V. without probable cause, while using

excessive force.

Finally, a failure to properly train officers may also support a finding of ratification (see

Bryson, 627 F.3d at 788), and A.V. vaguely argues that Sgt. Reilley lacked training on how to

handle encounters with someone with autism.  But the record on this argument is almost entirely

undeveloped, so A.V. has not raised enough facts to support this argument.

Accordingly, the court concludes Chief Boren and Duchesne County are not liable for

Sgt. Reilley's conduct.

---

[4] The one case cited by A.V., Gernetzke v. Kenosha Unified School Dist. No. 2, 274 F.3d 464 (7th Cir. 2001), in no
way addresses this issue, and it is unclear for what purpose A.V. cited it.

**ORDER**

The motion for summary judgment (ECF No. 51) is GRANTED for the first claim and is DENIED for the second and third claims, as against Sgt. Reilley.  The motion is GRANTED for all three claims as against Duchesne County and Chief Boren.

DATED this 8th day of October, 2019.

BY THE COURT:

TENA CAMPBELL
U.S. District Court Judge